**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JULIA K. WATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01549-TWP-MJD |
| | ) | |
| CAROLYN W. COLVIN Acting | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Julia K. Watt ("Ms. Watt"), requests judicial review of the decision of Defendant, Carolyn W. Colvin, Commissioner of Social Security Administration ("the Commissioner"), denying Ms. Watt's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **REMANDS** the Commissioner's decision for additional proceedings consistent with this opinion.

## I.    BACKGROUND

**A.    Procedural History**

On April 21, 2010 and May 11, 2010 respectively, Ms. Watt filed applications for DIB and SSI under the Social Security Act ("the Act"). She alleged disability commencing November 24, 2007 due to a back injury, spinal diseases, spinal malformations, chronic pain, and fibromyalgia. Her initial application was denied on August 10, 2010, and her application on reconsideration was denied on November 29, 2010. On March 29, 2012, Ms. Watt, accompanied by her attorney, appeared and testified at a hearing before an Administrative Law Judge, James Norris ("the ALJ"); two medical experts and a vocational expert also testified. On April 6, 2012, the ALJ denied the

application for disability, and the Appeals Council subsequently denied review, making the decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Ms. Watt filed this civil action, pursuant to pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for review of the agency's decision.

## B.    Factual Background

Ms. Watt was born in 1978; she was 29 years old on her alleged onset date and 33 years old at the time of the ALJ's decision. Ms. Watt completed high school and received a certification in proprietary communications systems, software processes, and design. She has relevant work experience in the computer software field as a senior engineer in telecommunications, help desk/customer service representative, and as an account executive at telecommunication companies.

### 1.    Facts Before the Alleged Onset Date of November 24, 2007

Ms. Watt has a long medical history of back surgeries and chronic pain. In 1991, she had Harrington rods placed due to scoliosis. In 1997, one of the rods dislodged and she had it removed and had a fusion from T6 to L4 with grafting from her hipbone. In 2000, Ms. Watt suffered a car accident when a semi-tractor trailer struck her head-on. Due to her injuries, her spine was fused from L4-5 and L5-S1 and she underwent an implantation of posterior instrumentation from T12 through her lumbar region to her sacrum. In 2002, Ms. Watt underwent electrotherapy to relieve her pain. From 2002 to 2004, she went through approximately thirty spinal injections.

In February 2004, after Ms. Watt experienced back pain and instability from her L4-5 and L5-S1 fusions, she went to the hospital for another spinal fusion from L4 to S1. She underwent lumbar interbody fusion surgeries at L4-5 and L5-S1 and had instrumentation placed from T11 to the sacrum. Thereafter, she experienced hip pain due to an incorrectly positioned screw at L2, which was subsequently corrected; she then had instrumentation placed from T10 to the sacrum.

Ms. Watt was released from the hospital; however, after her pain continued, she was started on Methadone and had her MS Contin dosage increased.

Ms. Watt met with orthopedic surgeon Jeffrey Kleiner, M.D., ("Dr. Kleiner") in August 2005. Dr. Kleiner noted that Ms. Watt continued to have symptoms of pain in her lower back and buttocks area and pain radiating into her anterior thighs; further, he indicated that Ms. Watt reported that she was able to sit comfortably for about twenty minutes, stand for five minutes, and walk short distances. In September 2005, Dr. Kleiner and another doctor performed the following procedures: (1) removal of posterior segmental Legacy instrumentation and Liberty crews; (2) exploration of fusion; (3) posterior lumbar osteotomy; (4) L3-L4 anterior lumbar discectomy; (5) L3-L4 osteotomy; (6) L3-L4 anterior lumbar spinal fusion with local bone graft; (7) L2-L5 posterior lumbar spinal fusion with posterior fusion cages with Allograft iliac crest, bone morphogenic protein. (Filing No. 18-6, ECF p. 6).

Vocational Rehabilitation Consultant Patrick Orbino, MA, CRC interviewed Ms. Watt and, in a report from August 30, 2006, wrote that Ms. Watt said that she continued to have constant, severe low back pain, left hip pain, right hip discomfort, and right lower extremity numbness. She continued to take MS Contin and Fentanyl (Actiq). She said she could sit for only about 20 minutes or stand for only a few minutes before her pain dramatically increased. She often had to lie down during the day to help control her pain.

After reviewing an MRI taken in January 2007, Dr. Kleiner recommended facet blocks. Ms. Watt went to Dr. Vilims on February 9, 2007, for C5-6 and C-7 intra-articular facet injections to determine how much, if any, of her pain was facet related. He noted that Ms. Watt was considering the option for a spinal cord stimulator to deal with her pain. When Dr. Vilims saw Ms. Watt on July 24, 2007, he diagnosed (1) post-laminectomy syndrome status post T11 through

S1 fusion and (2) cervical degenerative disc disease, cervical canal stenosis, and cervical radicular pain.  He added that Ms. Watt had undergone medical surgeries with chronic postsurgical pain.

### 2. Facts After the Onset Date of November 24, 2007

Ms. Watt went to Red Rocks Center for Rehabilitation ("The Center") from August 20, 2007, through June 17, 2008 (R. 332-41).  The Center's notes, however, are difficult to read.

On August 8, 2008, Ms. Watt met with pain management specialist Vishwajit Brahmbhatt, M.D. ("Dr. Brahmbhatt").  Dr. Brahmbhatt wrote that despite all of her surgeries, Ms. Watt continued to have a lot of pain.  Most of her pain, he said, was in the lower back, with stiffness and spasm, and radiated down both legs.  During the examination, Ms. Watt was able to walk without any support and was able to sit comfortably without any difficulty.  She had "[g]rossly restricted" lumbosacral ranges of motion.  ([Filing No. 18-7](#), ECF p. 48.)  Dr. Brahmbhatt diagnosed (1) post-lumbar laminectomy syndrome, (2) chronic arachnoiditis, and (3) chronic cervicalgia, "most probably secondary to herniated disk."  ([Filing No. 18-7](#), ECF p. 48-49.)  Ms. Watt's options for treating her back pain were extremely limited.  Dr. Brahmbhatt thought her best option would be to continue with medical management, including a narcotic "which she probably would need on a long-term basis."  ([Filing No. 18-7](#), ECF p. 49.)  He recommended a cervical epidural steroid injection for her neck pain.  Dr. Brahmbhatt administered an interlaminar epidural steroid injection at C6-7 on August 11, 2008.  ([Filing No. 18-7](#), ECF p. 50.)  Ms. Watt followed up with Dr. Brahmbhatt one month later and reported that she did not have any significant improvement in her symptoms from the injection and continued to use Opana and Actiq.  She denied any significant side effects from her medications.  Dr. Brahmbhatt wrote that Ms. Watt "will need some kind of narcotic coverage on an ongoing long-term basis" and had a detailed discussion with her about all possible side effects of long-term narcotics.  ([Filing No. 18-7](#), ECF p. 58.)

Dr. Brahmbhatt saw Ms. Watt on April 3, 2009, and noted that she had stiffness and loss of movement because of the extensive fusion from T6 to S1. She had been treated "with very high dosage[s] of different narcotics that include[d] morphine, Dilaudid, Fentanyl, Oxycodone, and Lortab," and nothing worked. ([Filing No. 18-7](), ECF p. 56.) She rated her pain at about a 6 to 7 on a 0-to-10 scale. She also had cervicalgia. Ms. Watt was able to walk without any support and was able to sit comfortably in a chair. Ms. Watt had no range of motion in the lumbar spine because of her fusion. Dr. Brahmbhatt diagnosed (1) chronic lower back pain syndrome with a history of previous back fusion that extended from T6 to S1 with multiple other back surgeries, and (2) history of high dosage of narcotic usage. ([Filing No. 18-7](), ECF p. 56.) Dr. Brahmbhatt spent about forty-five minutes discussing with Ms. Watt his concerns about her reliance on Actiq and warned her that Actiq is approved only for cancer breakthrough pain. He said that an intrathecal pump would better serve her. His long-term plan for Ms. Watt was to "take her off of the short-acting medication and try to manage her pain with long-acting pain killer without any potent drugs like Actiq." ([Filing No. 18-7](), ECF p. 56-57.)

Ms. Watt returned to Dr. Brahmbhatt in late April 2009 and said she was leaning towards having a pain pump inserted ([Filing No. 18-7](), ECF p. 54). She rated her pain about an 8 or 9. Three months later, Ms. Watt told Dr. Brahmbhatt that her pain was about a 6 or 7. Dr. Brahmbhatt was now having reservations about a pain pump. "Because of the extensive fusion," he wrote, "I was not sure whether we would be able to get the needle into the subarachnoid space or not. I reviewed the last x-ray, which showed a little bit of opening or possible space between L5 and S1 on the right hand side." ([Filing No. 18-7](), ECF p. 54.) Dr. Brahmbhatt hoped to access the subarachnoid space through that opening. ([Filing No. 18-7](), ECF p. 54.) He and Ms. Watt agreed to the pain pump, pending approval from Ms. Watt's insurance company. Dr. Brahmbhatt

diagnosed (1) chronic back pain syndrome and (2) laminectomy syndrome with possibility of chronic arachnoiditis. He renewed Ms. Watt's prescriptions for Opana and Actiq.

Ms. Watt first met with general practitioner Thomas Mabel, M.D. ("Dr. Mabel") on January 5, 2010. She met with Dr. Mabel another twelve times during the year of 2010; his notes mentioned Ms. Watt's chronic pain. Ms. Watt was receiving other treatment and examinations in 2010 as well. On January 26, 2010, an MRI of her cervical spine showed that at C5-6 "a left paracentral protrusion partially effacing the anterior subarachnoid space and causing minimal cord flattening and a mild central stenosis. Left sided uncovertebral spurring [was] noted causing mild to moderate left sided foraminal narrowing." (Filing No. 18-7, ECF p. 64). At C6-7, the MRI showed "a large left paracentral disc extrusion causing asymmetric left ventral cord flattening and a moderate central stenosis. There [was] significant compromise of the proximal aspect of the left neural foramen." (Filing No. 18-7, ECF p. 64).

Two days later, Ms. Watt saw neurosurgeon Thomas Leipzig, M.D. ("Dr. Leipzig"). Dr. Leipzig's notes discussed Ms. Watt's significant history of multiple surgeries and the subsequent fusions, revisions, and complications related to the procedures. Dr. Leipzig wrote that Ms. Watt had chronic pain syndrome.

The next day, anesthesiologist and pain management specialist Derron Wilson, M.D., administered a left C7 selective nerve root injection. The procedure did not change Ms. Watt's pain. On February 9, 2010, Dr. Leipzig performed an anterior interbody fusion and an anterior discectomy for decompression at C6-7. Although the MRI also showed abnormalities at C5-6, Dr. Leipzig decided to leave C5-6 alone for the time being. "Given her young age and multiple complications following multiple lumbar surgeries," Dr. Leipzig stated, "it was appropriate to just decompress the symptomatic level." (Filing No. 18-7, ECF p. 60). During surgery, Dr. Leipzig

found "one very large disk fragment [at C6-7], which came out."  ([Filing No. 18-7](#), ECF p. 61). He also found another fragment of disc "that was lodged under the C6 vertebral body, impinging on the root sleeve.  This was truly wedged in and [they] removed it . . . ."  ([Filing No. 18-7](#), ECF p. 61). On discharge, Ms. Watt had good relief of her severe arm pain.

On July 12, 2010, Eric Levine, M.D., ("Dr. Levine") examined Ms. Watt at the request of the Disability Determination Bureau.  Dr. Levine wrote that Ms. Watt "can maintain a shuffling gait without the use of an assistive devi[c]e."  ([Filing No. 18-8](#), ECF p. 29).  Her posture was normal.  Her ranges of motion were not; they were limited, especially in the lumbar spine.  Ms. Watt was able to walk on her heels and toes, and was able to tandem walk.  She had to hold on to the examination table to squat and could only do a half squat.  Her right hand grip was 4/5 and her sensation was normal to light touch, except for a fifty percent loss of sensation down her posterior right leg and right hand.

Disability Determination Bureau physician J. Sands, M.D., ("Dr. Sands") reviewed Ms. Watt's case on July 19, 2010.  Dr. Sands' primary diagnosis was spinal fusion.  Dr. Sands found that Ms. Watt could lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk at least two hours in an eight-hour day, and sit for about six hours in an eight-hour day.  Dr. Sands also endorsed several postural limitations.  Finally, Dr. Sands wrote that Ms. Watt was "credible for back pain and dec[reased] [range of motion]."  ([Filing No. 18-8](#), ECF p. 41).  At the reconsideration level, Disability Determination Bureau physician R. Fife, M.D., affirmed Dr. Sands' assessment.

Dr. Mabel wrote two letters describing Ms. Watt's abilities and limitations.  He wrote the first letter on September 3, 2010 when he met with Ms. Watt nine times in six months.  Dr. Mabel wrote the second letter on October 1, 2010, after he saw Ms. Watt another time.  In the first letter,

Dr. Mabel wrote that Ms. Watt "cannot stay in one position for more than 5 minutes without having to change position due to increasing pain. She will go from sitting to standing to pacing to back to standing over several minutes." (Filing No. 18-8, ECF p. 45). He added that Ms. Watt "not only is unemployable now due to her pain and disabilities, but her discs, joints and muscles will only worsen with age." (Filing No. 18-8, ECF p. 45). In the second letter, Dr. Mabel stated that Ms. Watt "had multiple back surgeries that have left her in chronic pain." (Filing No. 18-8, ECF p. 50). He said that Ms. Watt "is no longer able to maintain a constant position, instead she has to constantly change position, moving from sitting to standing, standing to leaning, leaning to sitting. She [had] trouble staying in any one position longer than four or five minutes . . . due to her constant pain." (Filing No. 18-8, ECF p. 50).

Ms. Watt completed a Disability Report - Appeal for the Social Security Administration and stated that she could no longer do housekeeping duties or duties outside the home without assistance. (Filing No. 18-8, ECF p. 55, 59). On January 7, 2011, Ms. Watt met with Indianapolis neurosurgeon David Steiman, M.D. ("Dr. Steiman"). Dr. Steiman wrote that he was stunned by Ms. Watt's medical history and recited much of that history, starting with the Harrington rods in 1991 and ending with the C6-7 fusion in 2010.

Ms. Watt went to Dr. Steiman because she was certain that a screw in her back had become loose. Dr. Steiman wrote that it became obvious to him that he could not provide a simple fix. He consulted with a neuroradiologist who said that one option was to remove Ms. Watt's hardware. Dr. Steiman wrote that even if the hardware was removed, "she may still have pain and still may have a problem." (Filing No. 18-8, ECF p. 97). Ms. Watt and Dr. Steiman discussed the possibilities of a spinal cord stimulator or an implantable pain pump. Dr. Steiman wrote that Ms. Watt "is the worst, unfortunately, definition for chronic pain patient. [Ms. Watt] is doing the best

she can. She is extremely knowledgeable about her situation . . . [but] she is running out of options." (Filing No. 18-8, ECF p. 97). Dr. Steiman believed that Ms. Watt's problems were beyond his expertise, and referred her to another neurosurgeon.

On January 13, 2011, Ms. Watt was to see Dr. Mabel, but arrived late and saw Jessica Sheely, M.D., ("Dr. Sheely") instead. Ms. Watt learned that her pain medicines (Opana and Fentanyl) were not covered by her insurance and went to the emergency room twice in the previous week because she had been out of her pain medications. She received Dilaudid and oxycodone in the emergency room, but said those medications were not touching her pain for more than about 30 to 45 minutes. Dr. Sheely diagnosed Ms. Watt with Chronic Pain Syndrome and wrote that Ms. Watt "may have some degree of hyperanalgesia, given [her] long-term use of narcotic pain meds with no real control of her pain." (Filing No. 18-11, ECF p. 88). Dr. Sheely suggested that Ms. Watt see a pain management specialist.

Elizabeth Gates, M.D., ("Dr. Gates") examined Ms. Watt at the request of the Social Security Administration. The examination took place on August 25, 2011. Ms. Watt was about eight months pregnant at the time. Ms. Watt's cervical and lumbar ranges of motion remained limited. In the meantime, Ms. Watt saw general surgeon Joseph Pavlik, M.D., ("Dr. Pavlik") on August 2, 2011, because of a ventral hernia. Ms. Watt wanted to know if she could have her hernia taken care of while she was open for her C-section, but Dr. Pavlik preferred that Ms. Watt see him after her delivery.

Psychologist Kelly Young, Psy.D. ("Dr. Young") evaluated Ms. Watt on August 31, 2011, at the Social Security Administration's request. Ms. Watt told Dr. Young that, with assistance, she could cook, clean, and help others with laundry and shopping. Ms. Watt delivered her baby by C-section on September 10, 2011. Doctors could not give her "spinal or an epidural" because

of all her previous back procedures and, instead, administered general anesthesia. (Filing No. 18-10, ECF p. 119).

Two months later, Ms. Watt met with Dr. Pavlik about her hernia. She reported that she successfully delivered via C-section, though she was told that she had a lot of adhesions. On March 14, 2012, Ms. Watt went to general practitioner Kenneth Watkins, M.D., in Winchester, Indiana. Ms. Watt described chronic pain secondary to multiple back injuries and surgeries. She reported that she was unable to sit, stand, or walk for any length of time, and said she spent most of her day lying down. She lived with her mother, who did the shopping and prepared the meals. She said that her baby now weighed 16 pounds and she could barely lift him.

Ms. Watt said that her last job was in April 2011, where she worked two months for Dansources. She said she was fired from that job when she was hospitalized for pregnancy complications. On examination, Ms. Watt's lumbar ranges of motion were limited. Straight-leg raising was positive bilaterally, right greater than left. Ranges of motion of her bilateral upper extremities were slow but full. Muscle tone was within normal limits. Muscle strength in the legs and arms was 4/5 bilaterally and hand grip was 3/5.

### 3. Ms. Watt's Testimony

Ms. Watt testified regarding all the surgeries and procedures that she underwent. She testified that Dr. Kleiner prescribed a walker that she used whenever she went outside since 2005. Ms. Watt said she experienced stabbing, aching, and throbbing pain and some pain that feels like she is being electrocuted. She had both cervical and lumbar surgeries planned for the future, including another removal of her lumbar hardware and possible implantation of a pain pump or electronic stimulator to control pain. She could stand for less than 5 minutes, walk about 30-40 feet unsupported and sit for less than five minutes. She testified that she could not squat and spent

most of the day lying down.  She claimed sleep problems and drowsiness from her medications; she also testified to difficulty finishing her sentences.  She testified that she could do very little in the house and, when she went to the grocery store, she used an electric cart.  She left the house only to go to doctor's appointments and her family did ninety-nine percent of the care of her baby.

### 4.    Testimony of Medical Expert James Brooks

James Brooks ("Dr. Brooks"), a licensed psychologist, testified as a medical expert that the evidence did not demonstrate the presence of a severe mental impairment.  He noted that at the mental evaluation in August 2011, Ms. Watt denied any symptoms of depression or anxiety, there was no psychiatric diagnosis, and the Global Assessment of Functioning score was assessed as 78.  He also pointed out that in 2012, a neurologist stated that her memory was intact, she had a normal attention span and concentration, and her knowledge was intact.

### 5.    Testimony of Medical Expert Karl Manders

Medical expert Karl Manders ("Dr. Manders") testified that the record did not indicate that Ms. Watt met or equaled a listing, although she has degenerative disc disease and underwent surgery.  He testified that she had a diagnosis of chronic pain syndrome, which means she had disorders that should have healed with appropriate treatment, but did not heal.  In his opinion, no further surgery would help her.  He viewed chronic pain syndrome as something to be evaluated under the mental impairment of Somatoform disorders, but Dr. Brooks had already testified that there was no evidence to substantiate such an impairment.  Dr. Manders thought Ms. Watt could do sedentary work so long as her medications did not cause cognitive impairment; the record did not reflect such deficiency.  He indicated that people with chronic pain syndrome felt their pain.

### 6.    Testimony of Vocational Expert Robert Barber

Vocational expert Robert Barber ("the VE") testified that Ms. Watt's past work was in the

computer software field, and was sedentary skilled work as a senior engineer in communications. She also ran a computer help desk and was an account executive. The ALJ posed a hypothetical question to the VE regarding an individual with Ms. Watt's vocational profile and the residual functional capacity for the full range of sedentary work. The VE testified that this individual could perform all of Ms. Watt's past relevant work. When posed with the hypothetical of whether the same type of jobs would be available if Ms. Watt was limited to residual work and if she experienced pain all day and was unable to work eight hours a day, five days a week, the VE responded no.

## II. DISABILITY AND STANDARD OF REVIEW

A claimant is entitled to DIB or SSI if she establishes she has a disability. Disability means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423 (d)(2)(A).

To determine whether a claimant is disabled, the ALJ employs a five-step sequential evaluation process. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities) that meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R.

Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is the "maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96–8p). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his

acceptance or rejection of specific evidence of disability.  *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. <u>THE ALJ'S DECISION</u>

The ALJ found that Ms. Watt met the disability insured status requirements of the Act through December 31, 2015.  He found that Ms. Watt had engaged in substantial gainful activity since her alleged onset date of November 24, 2007.  She had the following severe impairments: degenerative disc disease and chronic pain syndrome.  Ms. Watt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments at 20 C.F.R. pt. 404, subpt. P, app. 1.  She had the RFC to perform the full range of sedentary work and was capable of performing her past relevant work as a senior engineer in telecommunications, help desk/customer service representative, and account executive.  The ALJ found Ms. Watt was not under a disability, as defined in the Social Security Act, from November 24, 2010, through the date of the ALJ's decision.

### IV. <u>DISCUSSION</u>

Ms. Watt claims the ALJ's credibility analysis contains errors of fact and logic.  She argues that the ALJ understated the objective medical evidence in assessing her credibility regarding her chronic pain syndrome; erroneously concluded that her daily activities show that she can perform full-time sedentary work; failed to address her need to lie down; did not address the types of medications that she has used to alleviate her pain; and erroneously found her less than fully credible because she received unemployment benefits during a time she claimed to be disabled and she performed substantial gainful activity since her alleged onset date.  Ms. Watt additionally argues that the ALJ failed to evaluate the factors under 20 C.F.R. § 404.1527(d)(2) when the ALJ

decided not to give controlling weight to Dr. Mabel's opinions. Of these arguments, the Court finds that the ALJ made error with respect to the weight afforded to Ms. Watt's treating physician.

## A.     The ALJ's Credibility Analysis

### 1.     Objective Medical Evidence

Ms. Watt claims that the ALJ's observations of the objective evidence regarding her medical conditions understate the findings. First, she argues that Dr. Manders did not doubt her credibility and agreed that chronic pain in and of itself can be disabling. She disputes the ALJ's observations that her examinations were "generally unremarkable" except for "some decrease in range of motion in the lumbar and cervical spine" as a result of her surgeries. ([Filing No. 20](), ECF p. 21). Ms. Watt further alleges that the ALJ failed to appreciate the seriousness of her surgeries when the ALJ stated that the x-rays revealed no acute findings and that Ms. Watt was fused "only" at C6-7 and L2-L5. ([Filing No. 20](), ECF p. 21). The Government responds that the ALJ acknowledged that Ms. Watt does have a long history of significantly reduced motion in the lumbar spine, but that the limitations she indicates are often a result of the surgeries she underwent and do not, of themselves, prove debilitating pain.

The Court agrees with the Government. An ALJ must evaluate all relevant evidence when determining the claimant's RFC, including evidence of impairments that are not severe. *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012); *See* 20 C.F.R. § 404.1545(a). The Court will uphold an ALJ's decision if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. *Id.*; *See Eichstadt v. Astrue*, 534 F.3d 663, 665–66 (7th Cir. 2008). Although an ALJ does not need to mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion and may not ignore entire lines of contrary evidence. *Id.*; *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

An ALJ must also analyze a claimant's impairments in combination. *Id.*; *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

The process for evaluating a social security applicant's symptoms has two steps. First, the applicant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a), (b). Second, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a).

In Ms. Watt's case, the ALJ found that her medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, the ALJ stated that Ms. Watt's statements regarding the intensity, persistence and limiting effects of these symptoms were not credible because they were not consistent with the overall record. The ALJ then proceeded with the analysis of Ms. Watt's medical records. The ALJ took into account Dr. Manders' testimony that the evidence showed degenerative disc disease and chronic pain syndrome, but that the record did not contain anything to substantiate Ms. Watt's condition. The ALJ then proceeded to analyze the medical records of Ms. Watt's past surgeries and procedures of her cervical and lumbar spine from 2007 through 2011.

The ALJ further noted that in an examination from 2011, Ms. Watt presented worsening back but had fine motor skills and normal reflexes. In 2012, she was examined by an internal medicine doctor who found that "she had a normal appearing back, but a limited range of motion on flexion, extension, lateral bending and lateral rotation, . . . full range of motion in bilateral upper extremities[,] and [normal] gait and muscle tone." (Filing No. 18-2, ECF p. 38). The ALJ cited to specific evidence from the record to determine that Ms. Watt's impairments are not as

debilitating as she claimed them to be. The Court will not substitute the ALJ's judgment and will uphold this decision.

### 2. Daily activities

Ms. Watt claims that the ALJ failed to recognize the difference between the daily activities and the ability to hold a full-time job. The Government contends, however, that the ALJ did not fail to distinguish between daily activities and the ability to hold a full-time job; further, the ALJ merely pointed out inconsistencies with Ms. Watt's reports and her credibility.

An ALJ can appropriately consider a claimant's daily activities when assessing her alleged symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i); SSR 96-7. The ALJ must exercise caution against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft,* 539 F.3d at 680; *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Minimal daily activities do not establish that a person is capable of engaging in substantial physical activity. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), as amended (Dec. 13, 2000); *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).

In his ruling, the ALJ indicated a contradiction between Ms. Watt's testimony and what she reported in August 2011 during a consultative examination. During the hearing, Ms. Watt stated that she does no household chores or shopping, and only takes baths twice a week; she further stated that her family helps her shop and cares for her baby ninety-nine percent of the time. In 2011, Ms. Watt reported that she is able to maintain her own hygiene, cook, clean, do laundry, and shop with assistance. She reported that she can drive without difficulty on a daily basis, attend doctor appointments, and get things for the baby. The ALJ implies that these activities show a contradiction. The ALJ further stated that Ms. Watt's work activity is an indication that her daily activities have been somewhat greater than she has generally reported. The ALJ did not conclude

that based on her daily activities, Ms. Watt is able to hold employment. The Court holds that the ALJ properly considered Ms. Watt's daily activities as one of several factors in assessing her credibility.

### 3. Ms. Watt's need to lie down

Ms. Watt claims that the ALJ did not address her need to lie down in determining her RFC. Further, Ms. Watt states that contrary to the ALJ's assertion, other measures taken for relief of pain are inconsistent with her RFC. Ms. Watt cites *Young-Moore v. Colvin*, 2014 U.S. Dist. LEXIS 30973, 44 (N.D. Ind. Mar. 11, 2014) to support her argument that the ALJ did not properly consider her need to lie down. In *Young-Moore*, the ALJ's analysis was "deficient in following the requirements of SSR 96-7p . . . because the ALJ did not properly consider Plaintiff's medications, headaches, and need to lie down." The Court disagrees with Ms. Watt and finds that, unlike *Young-Moore*, the ALJ made a proper analysis of the factors under SSR 96-7p in determining her credibility.

To assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make a reasonable effort to obtain available information that could shed light on the credibility of the individual's statements, which may include any measures other than treatment the individual uses or has used (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board). SSR 96-7p. An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he or she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). The Court will give the ALJ's opinion a commonsensical reading, rather than nitpick the ALJ's opinion for inconsistencies or contradictions. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

In his decision, the ALJ addressed Ms. Watt's various complaints and discussed the pain in her neck, thoracic, and lumber areas with radiating pain to her arms and legs. The ALJ mentioned her inability to walk more than thirty to forty feet, and inability to sit more than five minutes without pain. Additionally, the ALJ acknowledged Ms. Watt's claim that she "lies down almost all day and does not perform chores or seldom goes anywhere due to pain." (Filing No. 18-2, ECF p. 37). In assessing her credibility, the ALJ found her only partially credible and concluded that "in general, the magnitude of pain and the extent of those symptoms and limitations are not supported by the medically acceptable clinical and diagnostic techniques." (Filing No. 18-2, ECF p. 39). The ALJ properly analyzed Ms. Watt's full record even though the ALJ did not state what weight, if any, was given to Ms. Watt's need to lie down. *See Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("An ALJ may disregard a claimant's assertions of pain if he validly finds her incredible"). The Court holds that the ALJ decision will be upheld.

### 4.        Types of Medications used

Ms. Watt contends that the ALJ failed to consider the type and dosage of the medications that she takes. She claims the ALJ failed to consider that she takes narcotics and potent drugs to help manage her pain, and that she previously went to the emergency room because she was out of pain medication. The Government argues that the record clearly indicated that Ms. Watt took strong narcotic medications. Further, the Government states that the ALJ was not required to find that Ms. Watt's use of strong narcotic medication supported her claim that she was disabled by pain. The Court agrees with the Government.

The ALJ must consider Ms. Watt's use of medication and when assessing her credibility, must consider various factors including the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms. 20 C.F.R. §

404.1529(c); SSR 96-7p.  The ALJ must justify the credibility finding with specific reasons supported by the record.  *Terry*, 580 F.3d at 477.  While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.  *See Herron*, 19 F.3d at 333.  The ALJ properly noted that Ms. Watt is prescribed Norco 10/325mg for pain, Synthroid for thyroid, Vitamin D for anemia, and Zegerid for heartburn.  He stated, however, that Ms. Watt's medical records do not corroborate the side effects of drowsiness, bowel problems, and difficulty finishing her sentences, as she claims.  The Court, therefore, finds that the ALJ sufficiently addressed the types of medications that Ms. Watt uses to alleviate her pain.

### 5.    Ms. Watt's Credibility because she received unemployment

Ms. Watt claims the ALJ found her less than fully credible because she applied for unemployment benefits and, instead, should have asked Ms. Watt why she applied during a time that she claimed to be disabled.  The Government argues that Ms. Watt has the burden to produce evidence that she was disabled.  While Ms. Watt does have the burden to prove her disability, the ALJ in a Social Security hearing has a duty to develop a full and fair record.  *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

Ms. Watt's application for unemployment benefits, however, may offer support to an ALJ's credibility determination.  *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("the ALJ regarded [plaintiff's] unemployment experience as one of many factors adversely impacting his credibility").  Here, the ALJ stated that applying for unemployment is "contrary to her application for disability benefits and will be taken into consideration when assessing her credibility."  (Filing No. 18-2, ECF p. 34).  The Court finds no error and will uphold the ALJ's decision.

### 6.    Ms. Watt's credibility on basis that she performed substantial gainful activity

Finally, Ms. Watt claims the ALJ found her less than fully credible based upon his finding

that she engaged in substantial gainful activity since November 24, 2007, the date that she alleges she became disabled. Ms. Watt asserts that the ALJ failed to develop her earnings since November 2007 as unsuccessful work attempts and that her work in 2008, 2010, and 2011 "may or may not have been unsuccessful work attempts . . . ." (Filing No. 20, ECF p. 38). For her job in 2008, she states that nothing on the record indicates what her job duties were, how long that job lasted, what difficulties she experienced, or why it stopped. She claims that neither the ALJ nor anyone else asked her about her work experience and, therefore, the ALJ erroneously held that the amounts she earned in 2008, 2009, 2010, and 2011 represented the amount for substantial gainful activity. The Government argues that there was no error in the ALJ using this factor to undermine Ms. Watt's credibility and even if there were error, this error would not make any difference because whatever work Mr. Watt did undermines her allegations, such as the need to stay in bed all day or to change positions every few minutes. Moreover, the ALJ did not base his credibility decision solely on the finding that Ms. Watt engaged in substantial gainful activity and he discussed other considerations in the sequential evaluation process. The Court is not persuaded by Ms. Watt's argument. In fact, Ms. Watts concedes that if it is error, it is unclear whether it is harmless. (Filing No. 20 at ECF p. 31). She cites *Allord v. Barnhart*, 455 F.3d 818 (7th Cir. 2006) where the court found that because the ALJ committed three errors in determining the claimant's credibility, it would be speculative to find the ALJ would have made the same credibility finding without the errors. However, an ALJ's credibility determination is entitled to substantial deference and it will not be overturned unless Ms. Watt can show that the findings are patently wrong. *Prochaska*, 454 F.3d at 738. Ms. Watt had not made that showing, therefore the Court holds that the ALJ did not

erroneously find Ms. Watt less than fully credible.

**B.      Failure to give controlling weight to the treating physician.**

Next**,** Ms. Watt claims the ALJ he failed to analyze the factors under 20 C.F.R. § 404.1527 when he decided not give controlling weight to the opinions of her treating doctor, Dr. Mabel.  She asserts that a complete evaluation of the factors suggests that more weight should be given to Dr. Mabel.  The Government argues that Ms. Watt's thirteen visits with Dr. Mabel in 2010 do not contain clinical findings of her alleged diagnosis and that during one of her visits, Dr. Mabel merely noted Ms. Watt's subjective allegations.   While the Government makes a plausible explanation, it is a post-hoc argument and, thus, will not be considered.  *See SEC v. Chenery Corp.*, 332 U.S. 194 (1947).  The Court agrees with Ms. Watt's argument to the extent that the ALJ should have analyzed the six factors when determining not to give Dr. Mabel's opinion controlling weight. Under 20 C.F.R. § 404.1527, the ALJ generally must give more weight to opinions from a claimant's treating sources, and will give the opinion controlling weight if the physician's opinion on the nature and severity of the impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [Ms. Watt's] case record."  20 C.F.R. § 404.1527(c)(2).  If the ALJ opts not to give a treating physician's opinion controlling weight, he must apply a number of factors to determine what weight to give the opinion, including 1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) support by relevant evidence; 4) consistency with the record as a whole; 5) the physician's area of specialization; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 202.1527(c)(2)-(6). The ALJ must "minimally articulate" his reasons for discounting a treating physician's opinion. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

In his decision, the ALJ only generally noted that Ms. Watt's treating physicians are "each accorded probative weight. No greater weight is accorded because their respective contacts with the claimant were of such short duration that none of them could have obtained a longitudinal view of the claimant and her impairments." (Filing No. 18-2, ECF p. 39). The ALJ cites SSR 96-2p as legal authority. Under the policy interpretation of SSR 96-2p, however, it further states that even when a treating source is not given controlling weight, "treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." The ALJ mentioned supportability in his analysis, but failed to address and evaluate the other five factors. The Court holds that the ALJ failed to consider the factors under 20 § C.F.R 404.1527(c)(2) and remand is warranted on this issue. On remand, the ALJ will analyze these factors and explain the weight given to Dr. Mabel's opinions.

## IV.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED.**

Date:   3/26/2015

Tanya Walton Pratt

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Timothy J. Vrana
tim@timvrana.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov